**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

FREDERICK DIAZ,

                                        Plaintiff,

            v.                                                          No. 08-CV-1208
                                                                            (LEK/DRH)

BRIAN FISCHER, Commissioner, Department
of Corrections; HAROLD D. GRAHAM,
Superintendent, Auburn Correctional Facility;
STEVEN BYRNE, Lieutenant; TIMOTHY QUINN,
Lieutenant; GREGORY REDMOND, Lieutenant,
Auburn Correctional Facility; JAMES CADY,
Correctional Officer, Auburn Correctional Facility;
ROBERT BURDICK, Correctional Officer, Auburn
Correctional Facility; and JOSEPH MERVILLE,
Correctional Officer, Auburn Correctional Facility

                                        Defendants.
_____

**APPEARANCES:**                              **OF COUNSEL:**

FREDERICK DIAZ
Plaintiff Pro Se
86-B-2129
Great Meadow Correctional Facility
Post Office Box 51
Comstock, New York 12821

HON. ANDREW M. CUOMO              ROGER W. KINSEY, ESQ.
Attorney General for the                   Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

_____

            [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Frederick Diaz ("Diaz"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, the DOCS Commissioner and seven DOCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Dkt. No. 1).  Presently pending is defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  Dkt. No. 25.[2]  Diaz opposes the motion.  Dkt. No. 27.  For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related herein in the light most favorable to Diaz as the non-moving party.  See subsection II(A) infra.

### A.  Work Placement

On April 3, 2006, Diaz was transferred to Auburn Correctional Facility ("Auburn"). Compl. ¶ 14.  Upon arrival at Auburn, Diaz was immediately verbally harassed by defendant Redmond, a Lieutenant.  Id.  ¶ 15.[3]  Shortly after his arrival, Diaz sought an employment placement.  Id.  ¶ 16.  Diaz claims that he was not offered an appointment "commensurate

---

[2] The motion is filed on behalf of all defendants except Byrne and Cady.  Dkt. No. 25 at 2. Byrne and Cady have both filed answers.  Dkt. Nos. 26, 39.

[3] Allegations of verbal harassment alone are not actionable under § 1983. See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed.").Therefore, even when the allegations of the complaint are liberally construed, the allegations here afford no basis for a claim under § 1983 and will not be further addressed.

with his education and skills, despite the fact that all the other inmates were being given programs of [their] choosing." Id. When Diaz protested, his privileges were limited. Id.

While on limited privileges, Diaz was repeatedly denied access to recreation, showers, and the law library, ordered to double bunk with another inmate, and placed in keeplock[4] when he refused the double bunking order. Compl. ¶ 17. During this time, Diaz continued to attempt to secure an employment position in the Shop Gate. Id. ¶ 21. Diaz was told that he was not permitted to join such a program, which he later learned was untrue, so he wrote multiple letters and grievances to defendant Graham, the Auburn Superintendent. Id. Graham responded that Diaz would still not be assigned to the Shop Gate program, regardless of whether it was permitted pursuant to internal policies and regulations. Id. As Diaz was continually offered nothing other than a porter position, he decided to run for a membership spot in the Inmate Grievance Resolution Committee (IGRC).[5] Id. ¶ 20.

The day after Diaz won the IGRC election, Graham approached him and offered a deal. Compl. ¶ 22. If Diaz resigned from his position on the IGRC, he would be given an employment placement in the law library and could join the Inmate Liason Committee. Id. Diaz accepted the offer and resigned. Id.[6]

───────────────────────

[4]"Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6.

[5]"DOCS maintains an Inmate Grievance Program (IGP)at all facilities. The first step requires an inmate to file a grievance with the IGRC. If such informal resolution fails, the inmate may then appeal to the facility superintendent and thereafter to the Central Office Review Committee. See Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004).

[6] To the extent that, liberally reading the complaint, Diaz contends that he should have received, or continued to occupy, a specific employment placement, such contentions are without merit. Prisoners do not have a constitutionally protected property

3

Diaz commenced working in the law library under the supervision of defendants Burdick and Merville, both corrections officers.  Compl. ¶ 23.  Burdick and Merville attempted to incite the other inmate library clerks into an altercation with Diaz, telling the other inmates that Diaz was a "snitch," and promoting Diaz to a coveted position over other inmate clerks who had been employed longer.  Id.  Shortly after Diaz refused the promotion, on December 27, 2006, Burdick issued a retaliatory misbehavior report against Diaz for his failure to report to work.  Id.  ¶ 24.  According to Diaz, the schedule was changed without his knowledge and he was not scheduled to work that shift.  Id.

At the subsequent disciplinary hearing, Diaz was found guilty for failing to attend work, sentenced to ten days keeplock[7], and referred back to the Program Committee for a new job assignment.  Compl. ¶ 25.  Diaz claims that Burdick and Merville tolerated known homosexual activity and drug use among the other inmate clerks, allowing them to retain

_____

interest in a certain employment or in continued employment.  See Johnson v. Rowley, 569 F.3d 40, 43-44 (2d Cir. 2009); see also Bulger v. United States Bureau of Prisons, 65 F.3d 48, 50 (5th Cir. 1995) (finding that termination and reassignment to a different job within the prison setting is neither atypical nor significant in relation to ordinary prison life); Newsom v. Norris, 888 F.2d 371, 374 (6th Cir. 1989) (holding that "the Constitution does not create a property or liberty interest in prison employment and that any such interest must be created by state law by language of an unmistakably mandatory character.") (citations and quotation marks omitted);  Karacsonyi v. Radloff, 885 F. Supp. 368, 370 (N.D.N.Y. 1995) ("Prison officials, however, have broad discretion in denying federal inmates the opportunity to [work].") (citations omitted).  Additionally, the Second Circuit has held that a "New York [state] . . . prisoner has no protected liberty interest in a particular job assignment."  Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996);  Hodges v. Jones, 873 F. Supp. 737, 745 (N.D.N.Y. 1995) (citations omitted) (holding that  inmates "ha[ve] no constitutional right to any particular position of employment.").  Accordingly, as a matter of law, Diaz has no liberty interest in his initial, or continued, employment, or any choice in which employment he should be assigned.

[7]"Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6 (2007).

their employment in the law library despite being adjudged guilty of more serious

disciplinary infractions which led to longer disciplinary sentence dispositions.  Id.  ¶ 28.

However, due to Diaz's propensity to file grievances, he was terminated from his position in

the law library despite his minor disciplinary infraction.  Id.  ¶¶ 28, 30.  Diaz was again

offered the porter position by the Program Committee, which he accepted, despite the fact

that it was given to him with "absolutely no consideration of [his] education and skills . . . ."

Id.  ¶ 30.

### B. Misbehavior Report for May 21, 2007 and Subsequent Disciplinary Hearing

On May 21, 2007, defendant Quinn, a Lieutenant, was sent to interview Diaz and

investigate the claims alleged in Diaz's grievance against Sgt. Cox, a non-party here.[8]

Compl. ¶ 37.  Quinn called Diaz into an interview room, but was not concerned with

investigating Diaz's concerns, as instead he "began to berate [Diaz] about his grievances."

Id.  ¶ 38.  During the interview, Quinn asked to see Diaz's identification ("ID") card.  Id.  ¶

39.  Diaz produced the ID card, which did not have a program sticker on it.  Id.  Quinn

threatened to place Diaz in keeplock for having improper documentation, but Diaz stated

that his card had recently been lost during transport and the replacement did not have a

sticker.  Id.  Quinn then asked Diaz why he had not reported to his assigned work program

as a porter, and Diaz responded that he was not called out to work that day.  Id.  ¶ 40.  At

this point, Quinn exited the interview room and ordered Diaz to report to work.  Id.  Upon

---

[8] On May 15, 2007, Sgt. Cox presided over one of Diaz's disciplinary hearings. Compl. ¶ 35.  During the hearing, Cox threatened Diaz, insisting that unless Diaz stopped filing grievances he would be subjected to "man law" by having fabricated charges brought against him, being assaulted by staff, and being sent to solitary confinement.  Id.

exiting the room, Diaz told Quinn not to contact him again.  Id. ¶ 41.  Quinn ordered Diaz

onto the wall, Diaz was "roughly" pat frisked, and threatened again by Quinn who stated that

the policies and procedures of Auburn did not apply to the corrections officers there. Id.

Before being returned to his cell, Diaz was informed that he was being sent to the Special

Housing Unit ("SHU")[9] for not reporting to work that day.  Id.  ¶ 43.

    Quinn charged Diaz with "refusing a direct order and refusing to accept a program

assignment by the Program Committee."  Compl. ¶ 45.  On May 26, 2007, defendant

Redmond. a Lieutenant, presided over the disciplinary hearing for the aforementioned

misbehavior report.  Id.  ¶ 46.  Diaz contends that the misbehavior report was false because

(1) he never told Quinn he removed his program sticker, (2) Diaz did accept the porter

assignment from the Program Committee or else he would have been on limited privileges,

and (3) he did not fail to refuse a direct order as he had never been called for his

employment on May 21.  Id.  Diaz could not develop his defense during the hearing

because Redmond failed to let him ask Quinn any questions.  Id. While Diaz was waiting for

the verdict of the hearing, he was placed in a holding room.  Compl. ¶ 47.  While in that

room, Diaz observed Quinn and Redmond conversing.  Id.  Then, Quinn came over to the

door of the holding room and began to curse at and berate Diaz.  Id. Ultimately Redmond

found Diaz guilty and sentenced him to 120 days in SHU.  Id. ¶ 47.

    Diaz wrote letters of complaint and grievances about Quinn and Redmond during the

---

[9]SHUs exist in all maximum and certain medium security facilities.  The units
"consist of single-occupancy cells grouped so as to provide separation from the general
population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b).  Inmates are confined in
a SHU as discipline, pending resolution of misconduct charges, for administrative or
security reasons, or in other circumstances as required.  Id. at pt. 301.

disciplinary hearing.  Compl. ¶¶ 47, 49.  Diaz also requested to see the videotape of the

hearing,[10] as well as asking Graham and Fischer to view the tape.  Id.  ¶¶ 48-49, 51-52.  On

June 1, 2007, Graham modified Diaz's disciplinary disposition to fourteen days in SHU and

forty-six days in keeplock, as well as 120 days loss of privileges.  Id. ¶ 48.  Graham's

modification was affirmed on administrative appeal on July 18, 2007, and the grievances

Diaz lodged in connection with this misbehavior report and disciplinary hearing were denied.

Id. ¶ 51.


### C. Conditions of Confinement

For the forty-six days in which Diaz was housed in keeplock, he was deliberately placed

in a filthy cell in retaliation for the grievances which he had previously filed against

defendants.  Compl.  ¶ 56.  Diaz's cell (1) contained a urine-stained mattress; (2) had filthy

walls and a dirty sink; (3) had a sink in need of repair; (4) required a new mattress and light

bulbs; and (5) lacked a desk and foot locker.  Id.  ¶¶ 56-57.  Additionally, while in keeplock,

guards placed a note on Diaz's cell labeling him "total whiner", until it was subsequently

removed by "a decent guard."  Id.  ¶ 57.  Diaz was also denied showers for two days.  Id. ¶

58.  In response, Diaz submitted a grievance against the staff.  Id.

---

[10] Diaz viewed the tape on June 27. It allegedly showed Diaz in the holding room, Quinn entering the room and conversing with Redmond, Quinn moving to the door of Diaz's room and exchanging words, and then Quinn returning to speak with Redmond. Compl. ¶ 50.

### D. Disciplinary Hearing on June 26, 2007 and Subsequent
### Misbehavior Report and Disciplinary Hearing

On June 26, 2007, Byrne presided over one of Diaz's disciplinary hearings.  Compl. ¶

60.[11]  During the hearing, Diaz interrupted Byrne when he began to read the misbehavior

report out of context.  Id.  ¶ 62.  Byrne strenuously advised Diaz not to interrupt him further.

Id.  This escalated into a verbal altercation, whereupon Diaz got up to leave the hearing and

Byrne ordered him to stop.  Id. ¶¶ 62-63.  Defendant Cady, a corrections officer who was

also present at the disciplinary hearing, prevented Diaz from leaving the room.  Id.  ¶ 63.

Diaz was then assaulted by both Byrne and Cady.  Id.  ¶¶ 63-64.  Additional officers

responded to the altercation and also began to batter Diaz alongside Byrne and Cady.  Id. ¶

64.  Throughout the entire assault, an audiotape was running, which was supposed to be

recording the disciplinary hearing.  Id.  ¶¶ 62-64.  Byrne ultimately found Diaz guilty of the

disciplinary infraction, sentenced him to thirty days keeplock, and also issued Diaz a

misbehavior report for assaulting an officer.  Id.  ¶¶ 69-70.  Diaz's disciplinary disposition

was upheld by Graham, despite the fact that he listened to the audiotape of the disciplinary

hearing.  Id.  ¶ 68.  However, on August 1, 2007, the misbehavior report was "expunged

from [Diaz's] record per Supt. Graham," overturning the thirty day disciplinary disposition.

Id.  ¶ 69.

On July 2, 2007, a disciplinary hearing was held for the misbehavior report for the

altercation on June 26.  Compl. ¶ 71.  During the hearing, the audiotape from June 26 was

---

[11] It is unclear what the disciplinary infraction was for which Diaz was being tried.
However, Diaz and Byrne had previously met as Byrne interviewed Diaz about previous
grievances he had submitted.  Compl. ¶ 61.  Prior to the hearing, Diaz inquired about the
status of his grievance investigation and Byrne was very agitated by Diaz's questions.  Id.

played, which was allegedly altered.  Id.  ¶ 72.  When Byrne was questioned about the

tape's authenticity, he explained he paused the tape player during the hearing in order to

converse privately with Diaz.  Id.  ¶ 73.  On July 9, 2007, Diaz was found guilty of assaulting

Byrne and Cady and sentenced to eight months in SHU.  Id.  ¶ 74.  Graham affirmed the

disciplinary disposition.  Id.  On September 13, 2007, the conviction and sentence were

report was reversed on administrative appeal due to the altered audiotape.  Id.  ¶ 75.


### E. Destroyed Property

Diaz also claims that when he was sent to SHU or keeplock, the retaliation against him

was exacerbated and perpetuated by defendants throwing away and damaging his personal

property.  Compl. ¶¶ 53, 77.  Diaz wrote letters to Graham complaining about the

destruction of his property, but no investigation was ever commenced.  Id.  ¶ 53.


## II.  Discussion

In his complaint, Diaz alleges that his First Amendment rights were violated when

defendants continually authored false misbehavior reports against him for filing grievances.

Additionally, liberally reading the complaint, Diaz contends that his Eighth Amendment

rights were violated when he was subjected to (1) unconstitutional conditions of

confinement during his forty-six days in keeplock and (2) excessive force by defendants

Bryne and Cady during his disciplinary hearing.  Lastly, Diaz asserts that his Fourteenth

Amendment rights were violated when he was subjected to (1) multiple false misbehavior

reports, (2) faulty procedural due process during disciplinary hearings, (3) damaged

personal property,[12] and (4) an Equal Protection violation as Diaz was terminated from his job position in the library when other similarly situated inmates were allowed to continue with their employment placement.  Defendants assert that (1) Diaz has failed to demonstrate the personal involvement of defendants Fischer, Quinn, and Graham; (2) there is no merit to Diaz's due process, retaliation, or equal protection claims; (3) the Eleventh Amendment bars suit of defendants in their official capacities;[13] and (4) defendants are entitled to qualified immunity.

---

[12] An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue.  Hudson v. Palmer, 468 U.S. 517, 533 (1984).  "New York courts provide such a remedy . . . [through the] initiat[ion of] an Article 78 proceeding in New York Supreme Court . . . ."  Gabis v. New York City Taxi & Limousine Comm'n, No. 05-CV-8083 (HB), 2005 WL 2560384, at *3 (S.D.N.Y. Oct. 12, 2005); see also N.Y. C.P.L.R. §§ 7803, 7804; Locurto v. Safir, 264 F.3d 154, 174 (2d Cir. 2001) ("An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims.") (citations omitted); Campo v. New York City Employees' Ret. Sys., 843 F.2d 96, 101 (2d Cir. 1988) ("Article 78 . . . provides a summary proceeding which can be used to review administrative decisions.").  State law also provides that "[a]ny claim for damages arising out of any act done . . . within the scope of . . . employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state."  N.Y. Corr. Law § 24(2).  In this case, Diaz contends that there were unconstitutional deprivations when his property was destroyed by corrections officers.  Compl. ¶¶ 53, 77.  First, the Article 78 procedure exists.  Second, because Diaz is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24.  Thus, the correct venue to litigate these claims is in state court.  Accordingly, defendants' motion should be granted as to this claim.

[13] Diaz has clarified, in his opposition papers, that he "is suing the defendants in their individual capacities [and] . . . refer[ed] to the official title . . for reference purposes only . . . ."  Dkt. No. 27.  Accordingly, since Diaz clearly sues the defendants only in their individual capacities, the Eleventh Amendment bar to suits against state officials in their official capacities is inapplicable.

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim.  When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).  However, this "tenet . . . is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility . . . that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (citations omitted).  Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950-51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled
> to "special solicitude," . . . that a pro se litigant's submissions must be
> construed "liberally,". . . and that such submissions must be read to raise the
> strongest arguments that they 'suggest. . . . .  At the same time, our cases
> have also indicated that we cannot read into pro se submissions claims that
> are not "consistent" with the pro se litigant's allegations, . . or arguments that
> the submissions themselves do not "suggest, . . ." that we should not "excuse
> frivolous or vexatious filings by pro se litigants" . . . and that pro se status
> "does not exempt a party from compliance with relevant rules of procedural
> and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537

F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds *pro se*, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)).


## B. Conditions of Confinement

To the extent that, liberally reading Diaz's complaint, such a claim is raised, it is without

merit.  First, Diaz fails to identify the individuals responsible for his placement and care in

keeplock.  " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  Second, "[t]he Constitution

does not mandate comfortable prisons but neither does it permit inhumane ones, and it is

now settled that the treatment a prisoner receives in prison and the conditions under which

he is confined are subject to scrutiny under the Eighth Amendment."  Farmer v. Brennan,

511 U.S. 825, 832 (1970). As with other Eighth Amendment claims, a "plaintiff must satisfy

both an objective . . . and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir.

1996) (citations omitted).  Thus, "[c]onditions of confinement only constitute an Eighth

Amendment violation if they involve the deprivation of a single identifiable human need or

denial of the minimum civilized measure of life's necessities, and the defendants' state of

mind was one of deliberate indifference to that deprivation."  Johnson v. Smith, No.

9:03CV1050 (FJS/DEP), 2006 WL 1843292, at *9 (N.D.N.Y. June 29, 2006) (Scullin, J.)

(citations omitted).

    The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an Eighth
> Amendment violation] when each would not do so alone . . . [such as] when
> the conditions have a mutually enforcing effect that produces the deprivation
> of a single, identifiable human need such as food, warmth, or exercise – for
> example, a low cell temperature at night combined with a failure to issue
> blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists."  Id. (citing

Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison

official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate

health or safety"  Farmer, 511 U.S. at 834 (citations omitted).

    Diaz claims that while in keeplock, he had a stained mattress, dirty walls and sink, and

lacked a desk and foot locker.  However, Diaz has failed to show how these conditions rose

to the level of substantial risk of serious harm or denial of an identifiable human need.  See

Davidson, 371 F. Supp. 2d at 370.  Diaz makes no contention of how  a dirty wall and sink

and stained mattress inhibited his ability to eat, sleep, or remain at an adequate

temperature.  Additionally, there are no claims for illness or injury.  At best, these are

conclusory allegations that are wholly insufficient to state an Eighth Amendment violation.

Moreover, Diaz's claims that he was not offered a shower for two days are also insufficient

13

to state an Eighth Amendment violation.  See  Beckford v. Portuondo, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (citations omitted) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."); see also Cosby v. Purkett, 782 F. Supp. 1324, 1329 (E.D. Mo. 1992) (holding that access to showers every seventy-two hours is not a violation under the Eighth Amendment).  Accordingly, Diaz has failed to establish the objective element of the analysis.

Lastly, as discussed supra, verbal harassment alone is insufficient to allege a constitutional violation.  Accordingly, defendants' motion as to any such claim should be granted.

## C. Personal Involvement

Defendants contend that Diaz has failed to allege the personal involvement of Fisher, Quinn, and Graham.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

### 1. Fischer

A position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement.  Wright, 21 F.3d at 501. Thus, Fisher cannot be held liable solely because he, as Commissioner, held a supervisory position.  The gravamen of Diaz's Complaints against Fischer is that he was continually written to, and failed to respond.  Compl. ¶¶ 29, 3, 52, 76.  However, failure to respond to a grievance is insufficient to allege personal involvement.  Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . .").  Additionally, there were no allegations, nor does the record support any contentions, that Fischer was directly involved in any of the alleged violations, that Fischer failed to remedy a wrong of which he was informed, that he was grossly negligent in supervising subordinates, or that he was deliberately indifferent to the health and safety of Diaz.

Accordingly, defendants' motion should be granted and Fischer should be dismissed from the present action.

**2. Quinn**

Diaz has unequivocally alleged that Quinn was directly responsible for writing a false misbehavior report on May 21, 2007, and also influenced Redmond's decision at his subsequent disciplinary hearing on May 26, 2007.  Compl. ¶¶ 45, 47.  As such, Diaz has plausibly contended that Quinn was responsible for his alleged constitutional violations. Whether there is any substantive merit to said violations is a separate issue and discussed infra.   Accordingly, defendants' motion on this ground as to Quinn should be denied.

**3. Graham**

As previously discussed, holding a supervisory position, without more, is insufficient to allege personal involvement.  Wright, 21 F.3d at 501.  Additionally, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").  Defendants argue that Diaz's contentions center around Graham's lack of response to his complaints.  However, Diaz alleges that Graham personally investigated and acted on Diaz's complaints.  For example, Graham allegedly listened to the audiotape of the June 26, 2007 disciplinary hearing before affirming both disciplinary dispositions.  Compl. ¶ 74.

Additionally, Diaz contends that after the May 26, 2007 disciplinary hearing, he asked

Graham to review the videotape of the hearing, thus providing Graham with notice of a

constitutional violation which was allegedly ongoing with his continued segregation.

Graham refused to review the tape prior to affirming the disciplinary disposition.

> It has been held that "an appropriate guiding principle" for
> determining personal responsibility is where a grievance alleges an
> "ongoing" constitutional violation, the supervisory official who
> reviews the grievance is "personally involved" if he is confronted
> with a situation that he can remedy directly.  If the official is
> confronted with a violation that has already occurred and is not
> ongoing, then the official will not be found personally responsible for
> failing to "remedy" a violation.

Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (internal citations omitted).

Thus, Graham's knowledge was not that of a "violation . . . that has already occurred and is

not ongoing," it was continuous and his failure to remedy the situation is sufficient to allege

personal involvement.  Id.

Accordingly, defendants' motion on this ground as to Graham should be denied.


**D. Retaliation**

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's

conduct was constitutionally protected and that this protected conduct was a substantial

factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75,

79 (2d Cir. 1996).  "Under this analysis, adverse action taken for both proper and improper

reasons may be upheld if the action would have been taken based on the proper reasons

alone."  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008) (citing

Graham, 89 F.3d at 79).  Additionally, courts must view retaliation claims with care and

skepticism to avoid judicial intrusion into prison administration matters.  Id.  Conclusory

allegations alone are insufficient.  Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983).)).

First, as discussed infra section II(E)(2), Diaz's misbehavior reports were written for a proper purpose. Additionally, Diaz has failed to allege or prove facts to support a retaliation claim against Merville and Burdick.  The misbehavior report which Burdick authored, and Merville endorsed, occurred shortly after Diaz refused to accept a promotion.  Compl. ¶¶ 23-24.  Diaz's employment status does not represent a constitutionally protected activity. See  supra note 4.  Thus, this cannot provide a basis by which to assert a retaliation claim. Instead, Diaz appears to rely upon his grievances as his constitutionally protected conduct. Compl. ¶¶ 28, 30.  While filing grievances is an activity protected by the First Amendment, Diaz fails to identify a time when he filed grievances against Merville and Burdick prior to the issuance of the allegedly false misbehavior report.  Thus, defendants' adverse actions of filing the misbehavior report could not be a substantial factor in the alleged retaliation because the grievances against them were filed after the misbehavior report, not before. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. Jackson, 549 F. Supp. 2d at 215.

Similarly, Diaz has failed to allege or prove facts to support a retaliation claim against Quinn.  Quinn investigated a grievance which Diaz filed against an unnamed corrections officer.  Throughout the interview, Diaz and Quinn exchanged words, Quinn ordered Diaz to report to work, Diaz left the interview and failed to report to work, and was given a misbehavior report for failing to follow a direct order and participate in his programming. Compl. ¶¶ 38-45.  Diaz filed a grievance against Quinn after the disciplinary hearing took

18

place.  Id.  ¶¶ 47, 49.  As previously discussed, this constitutionally protected activity

occurred after the adverse action of the misbehavior report, and not before.  Thus, the

grievances could not serve as a substantial cause for the report.  Furthermore, conclusory

and general allegations that Diaz was retaliated against because of his reputation for filing

grievances in the past is insufficient to maintain the present claim.  Jackson, 549 F. Supp.

2d at 215.

The same is true, with regard to the misbehavior reports and disciplinary hearing

occurring prior to June 2007, for Graham.  Graham's actions in affirming the hearing

decisions were allegedly in retaliation for Diaz's filing of grievances against the other

defendants.  These conclusory allegations are insufficient to plausibly state a retaliation

claim.

Accordingly, defendants' motion on this ground should be granted.


### E.  Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process

must establish the existence of a protected interest in life, liberty, or property. See Perry v.

McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a

prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84

(1995). This standard requires a prisoner to establish that the deprivation was atypical and

significant in relation to ordinary prison life.  Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28

(2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate

has been disciplined with a SHU confinement alone is insufficient to establish an atypical

19

and significant deprivation.  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y.1998) (citing Brooks v. DiFasi, 112 F.3d 46, 49 (2d Cir.1997)).

## 1. Preclusion

Diaz alleges due process violations occurring during his disciplinary hearing in connection with the December 27 misbehavior report and the hearing on May 26, 2007 in connection with the May 21 disciplinary report.  However, such claims run afoul of the "favorable termination" rule of Heck v. Humphrey, 512 U.S. 477, 487-87 (1994).  That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983.  This rule apples to challenges to procedures used in prison disciplinary proceedings.  Edwards. v. Balisok, 520 U.S. 641 (1997).

There is no evidence that Diaz's disciplinary determinations were ever vacated with regard to these two proceedings.[14]  While Diaz's sentence was modified with respect to the May 26 hearing, it was never overturned or expunged.  Thus, the Heck rule still applies and any procedural challenges are barred.  Therefore, because Diaz's recovery of damages here for a false misbehavior report would necessarily imply the invalidity of his conviction,

_____

[14] Diaz's claims concerning the June 26, and July 2, 2007 disciplinary hearings are not raised in the present motion.

the based on that hearing is barred.

Accordingly, defendants' motion should be granted as to these claims.


## 2. False Misbehavior Reports

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)).  "There must be more, such as retaliation against the prisoner for exercising a constitutional right." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (citing Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir. 1988)).

As discussed supra, Diaz has failed to establish facts sufficient to allege a retaliation claim.  Thus, the present claim must also fail.  Moreover, as discussed supra, such a finding of a false misbehavior report runs afoul of Heck and its progeny.  Finally, as established by the record, Diaz's misbehavior reports were supported by sufficient evidence.

In the first case, Diaz does not dispute that the schedule indicated that he needed to be at work and he was not there.  Compl. ¶ 24.  The factual issues of when the schedule was changed and what it actually indicated were determined at the hearing, which concluded with a finding of guilt and has not been overturned.  Similarly, the second misbehavior report cited Diaz's failure to follow a direct order and participate in his employment.  Quinn's order to Diaz to report to work, whether or not he was previously called out, was a direct order with which Diaz failed to comply.  Id. ¶¶ 40, 43, 45.  Any other factual issues were necessarily addressed during the disciplinary hearing which resulted in a finding of guilt

which was never expunged or overturned.  Accordingly, in both cases, Diaz was found guilty

of the offense charged.  Such findings were also consistent with the allegations in the

complaint.  While there are some disputed facts as to why the schedule was incorrect or

whether Diaz was actually called for work, those facts were determined in the disciplinary

hearings.

Accordingly, defendants' motion should be granted as to these claims.


### 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under

the law.  Essential to that protection is the guarantee that similarly situated persons

 be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439

(1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the

Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than

others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective
> adverse treatment of individuals compared with other similarly
> situated individuals if such selective treatment was based on
> impermissible considerations such as race, religion, intent to inhibit
> or punish the exercise of constitutional rights, or malicious or bad
> faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and

citations omitted).  In the prison setting, inmate treatment is evaluated pursuant to a rational

basis standard.  Phillips, 408 F.3d at 129 (citing Shaw v. Murphy, 532 U.S. 223, 229-230

(2001)).  Thus, in order to establish an equal protection violation, the plaintiff must show

that "the disparity in treatment cannot survive the appropriate level of scrutiny which . . .

22

means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests."  Id.

If an inmate cannot "allege membership in [a protected] class, he or she can still prevail in . . . a class of one equal protection claim."  Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotations and citations omitted).  Similarly, to succeed, plaintiffs must show "that they were intentionally treated differently from other similarly-situated individuals without any rational basis."  Clubside, Inc. v. Valentin, 468 F.3d 144, 158-59 (2d Cir. 2006). Additionally, to be successful, plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves . . . ."  Neilson, 409 F.3d at 104.

Here, Diaz contends first that he was not given the preferential employment treatment he deserved when he made a deal with Graham.  Compl. ¶ 22.  As the Equal Protection Clause bars deprivations and unequal treatment, such claims for preferential treatment are not within its bounds.  Moreover, Diaz fails to allege facts sufficient to conclude that others who made similar deals with Graham were treated differently.

Additionally, Diaz claims that the sanction of losing his employment was more severe than that received by other inmates who had been adjudged guilty of more serious disciplinary infractions and sentenced to more severe dispositions.  Such general claims fail to identify which individuals intentionally treated him differently.  See Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995) ("To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable . . . class.").  The named defendants did not appear to have any involvement in Diaz's employment placement.  At Diaz's hearing, he was referred back to the Inmate Program Committee for assignment.

23

Compl. ¶ 25.  This committee, the members of which are not named in the present action,

appears to have the authority to place inmates in a job assignment.  The moving

defendants are neither on the Program Committee nor vested with the authority to provide

Diaz with employment options.  Reliance on Fischer or Graham for such power is neither

alleged nor inferable from the record.  Additionally, none of the other moving defendants

acted as hearing officers or imposed Diaz's sentences.  Thus, no evidence has been

proffered that any moving defendant purposefully discriminated against Diaz.

Accordingly, defendants' motion should be granted as to the equal protection claim.


## F. Qualified Immunity

Defendants claim that they are entitled to qualified immunity.  Qualified immunity

generally protects governmental officials from civil liability "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.

Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov.

10, 2003).  However, even if the constitutional privileges "are clearly established, a

government actor may still be shielded by qualified immunity if it was objectively reasonable

for the . . . official to believe that his [or her] acts did not violate those rights."  Smith v. City

of Albany, No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting

Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d

364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there

would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there

is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. <u>Aiken</u>, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached concerning Diaz's claims because, as discussed <u>supra</u>, accepting all of Diaz's allegations as true, he has not shown that defendants violated his constitutional rights.

Accordingly, in the alternative, defendants' motion should be granted on this ground.


## III.  Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 25) be **GRANTED** in all respects and that the complaint be **DISMISSED** as to defendants Fischer, Graham, Quinn, Redmond, Burdick, and Merville as to all claims against them.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  February 23, 2010
        Albany, New York

_David R. Homer_

United States Magistrate Judge